# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and the STATE OF TENNESSEE, *ex rel.* DR. JASON NOLAN and DR. MEIKLEJOHN MCKENZIE,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 3:20-cv-00978** |
| **HCA HEALTHCARE, INC., et al.,** | ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Dr. Jason Nolan and Dr. Meiklejohn McKenzie ("Relators") brought this *qui tam* lawsuit pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729, and the Tennessee Medicaid False Claims Act ("TMFCA"), Tenn. Code Ann. § 71-5-182. The gravamen of their lawsuit is that the HCA Defendants[1] and PathGroup Defendants[2] allegedly participated in an illegal kickback scheme related to payments and referrals for anatomic pathology services.

Before the Court are the HCA Defendants' Motion to Stay Litigation & Compel Arbitration or, in the Alternative, to Dismiss Complaint, (Doc. No. 72), and the PathGroup Defendants' Motion to Dismiss, (Doc. No. 74). These motions are fully briefed and ripe for decision. (See Doc. Nos. 73, 75, 84–87). The United States also filed a Statement of Interest (Doc. No. 89), to

---

[1] The HCA Defendants are: (1) HCA Healthcare, Inc.; (2) HCA Inc.; (3) HCA Health Services of Tennessee, Inc. d/b/a Tristar Summit Medical Center; and (4) Hendersonville Hospital Corporation d/b/a Tristar Hendersonville Medical Center.

[2] The PathGroup Defendants are: (1) PathGroup Labs, LLC; (2) PGI Holdings, Inc.; (3) Associated Pathologists, LLC d/b/a PathGroup; and (4) Jabodon PT Company d/b/a Pritzker Group Private Capital.

which the HCA Defendants responded, (Doc. No. 92), and the United States replied (Doc. No. 100). For the following reasons, the Court will deny the motion to compel arbitration and grant the motions to dismiss.

## I. FACTUAL ALLEGATIONS AND BACKGROUND[3]

### A. The Parties

Relators are co-owners of a pathology laboratory called Pathologists' Laboratory, P.C. ("PLPC"). (Doc. No. 1 ¶¶ 1, 3, 61). For "several decades," PLPC contracted to be the exclusive anatomic pathology[4] lab for two hospitals—Tristar Summit Medical Center and Tristar Hendersonville Medical Center ("HCA Hospitals"). (Id. ¶¶ 3, 58). PLPC is "a general pathology lab" that performed anatomic pathology tests itself; in addition, the HCA Hospitals would also request "highly specialized tests" that PLPC could not perform. (Id. ¶ 63). When the HCA Hospitals "provided a tissue sample to PLPC and requested such a specialty test, PLPC would send the sample out to one of these reference labs" for testing. (Id. ¶¶ 63–64).

### B. Before 2012, Insurance Providers Reimbursed Laboratories for All Their Costs

The HCA Hospitals' patients had healthcare coverage through various insurance providers, including federal providers like Medicare Part A ("Medicare") and Medicare Part C ("Medicare Advantage"), and Tennessee providers like TennCare and Blue Cross Blue Shield of Tennessee ("Blue Cross"). (Id. ¶¶ 13, 46). Historically, these insurance providers would pay or reimburse PLPC and the specialty reference labs for providing anatomic pathology services for the hospitals' patients. (Id. ¶¶ 50). The insurance providers made these payments in two parts: (1) the

_____

[3] Unless noted otherwise, the Court draws the facts in this section from the Complaint (Doc. No. 1) and assumes the truth of those allegations for purposes of ruling on the instant motions. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

[4] "Anatomic pathology" refers to tests conducted on tissue specimens (*i.e.* biopsies) for diseases. (Id. ¶ 47).

*professional component* ("PC") for the "work done by the pathologist examining the tissue sample and creating a report;" and (2) the *technical component* ("TC") for "the equipment, supplies, personnel, etc. necessary for conducting the examination." (Id.). Until July 2012, all insurance providers would reimburse the labs directly for *both* the PC and TC. (Id. ¶¶ 5, 13, 50).

     C.    <u>In 2012, Medicare Changes its Rules and Stops Paying TC Costs</u>

In July 2012, the Centers for Medicare & Medicaid Services ("CMS")[5] implemented new billing rules for *Medicare* (including "traditional Medicare, Railroad Medicare, Tricare, and CHAMPUS") and stopped paying labs directly for the TC charges for services performed for *Medicare* beneficiaries. (Id. ¶¶ 5, 52). Relators allege that Medicare would continue reimbursing PLPC directly for the PC charges under the new rule, but that the rule required the HCA Hospitals to start reimbursing PLPC for TC charges. (Id. ¶ 6; see also 42 C.F.R. § 415.130(d)(2)).

CMS explained that the "lump sum reimbursements" it had been paying hospitals "already factored in the [TC] costs of pathology lab testing, and that providing separate payments directly to the outside pathology labs performing that testing amounted to paying twice for the same service." (Doc. No. 1 ¶ 53). CMS further explained, according to Relators, that "[i]t would be improper to continue to allow hospitals to receive [Medicare] Part A payments that reflect the TC of physician pathology services and simultaneously allow an independent laboratory to bill and be paid under the physician fee schedule for the same service." (Id. (citation omitted)). With this rule change, CMS expected the "independent pathology labs" to "contract directly with the hospitals with whom they did business for their [TC] payments." (Id. ¶ 54). CMS also warned hospitals that if they "were to condition, express or implied, the referral of physician pathology services to a clinical laboratory," like PLPC, "on the lab's agreement to accept less than fair market

_____

[5] CMS is a federal agency previously known as the Health Care Financing Administration.

value for the" TC, that could implicate the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). (Doc. No. 1 ¶ 56 (citing Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2000, 64 Fed. Reg. 59408, Nov. 2, 1999)).

The HCA Hospitals complied with this rule by agreeing to reimburse PLPC for the TC charges for traditional *Medicare* patients.[6] (Id. ¶ 7). The HCA Hospitals and PLPC memorialized this pay structure by entering into new Professional Services Agreements. (Doc. Nos. 72-2 at 18; 72-5 at 17–18). Of note, each of those agreements included provisions for Alternate Dispute Resolution. (Doc. No. 72-2 at 9–10 (Section 5.O); Doc. No. 72-5 at 10–11 (Section 5.O)).

The Professional Services Agreements addressed the *Medicare* rule change, but they did not address the looming question of *who* was responsible for the TC charges when patients were covered by "Other Insurers," including Medicare Advantage, TennCare, and Blue Cross. (See Doc. No. 1 ¶¶ 13, 70, 94). Would Other Insurers continue reimbursing the labs directly, just as they had done for years? Were the hospitals now responsible for these charges, just like they were for Medicare beneficiaries? Or were the labs expected to just eat these costs moving forward?

D.     Between 2012 and 2018, Other Insurers Also Stop Paying TC Costs

The Complaint alleges, without explanation, that the 2012 CMS Medicare rule change also applied to Other Insurers, and therefore those insurers "had no obligation" to pay TC charges anymore. (Id. ¶¶ 55, 66). By extension, Relators allege that the *HCA Hospitals* were legally required to pay the TC costs for any pathology test that PLPC or a specialty reference lab performed, regardless of whether the patient was covered by Medicare or Other Insurers. (See, e.g., id. ¶¶ 4–5). Nevertheless, Other Insurers continued reimbursing TC charges for PLPC and specialty reference labs for years after the new CMS rule went into effect. (Id. ¶¶ 55, 66, 84).

---

[6] These agreements are substantively identical for all purposes relevant to the pending motions. (See Doc. No. 73 at 4–5 n.3).

For reasons not explained in the Complaint, Other Insurers stopped making TC payments in or around early 2018.  (Id. ¶¶ 9, 63–66, 84–85).  Once this happened and PLPC stopped receiving TC payments from insurers, PLPC demanded that the HCA Hospitals start paying these costs instead.  (Id. ¶ 142).  The HCA Hospitals refused.  (Id. ¶¶ 7, 66, 84).  They did so because nothing in the 2012 CMS rule or the Professional Services Agreements required them to provide any TC payments for patients covered by Other Insurers.  (Id.).  The HCA Hospitals took the position that *PLPC* was responsible for incurring or paying the TC charges itself.  (Id. ¶¶ 66, 84).

PLPC disagreed.  It found it "unfathomable" that the HCA Hospitals would condition patient referrals on PLPC agreeing to: (1) forego receiving TC payments for anatomic pathology services that PLPC performed for the hospitals' patients (essentially providing those TC services for free); or (2) pay specialty reference laboratories out-of-pocket for their TC charges when the hospitals requested specialized testing.  (Id. ¶ 72).  The Complaint alleges that PLPC continued to pay these TC charges anyway because otherwise "the reference labs would then stop taking referrals from PLPC altogether—which would in turn significantly limit PLPC's ability to provide for all of the testing that the hospitals' patients might need."  (Id. ¶¶ 14, 74).

E.      The HCA Defendants Replace PLPC with PathGroup

In early 2018, this arrangement (where *PLPC* paid TC charges) became "untenable" for PLPC based on a combination of Medicare Advantage plans becoming more popular, PLPC "receiving an increasing number of invoices from specialty reference laboratories" for TC charges, and Blue Cross announcing "it was going to cease reimbursing pathology labs for the [TC] of any anatomic pathology service" starting in 2019.  (Id. ¶¶ 63, 75, 84–85).  PLPC again pushed the HCA Hospitals to pay TC charges for patients covered by Other Insurers, just as the hospitals had previously done for patients covered by Medicare.  (Id. ¶¶ 86–89, 127–28).  During these negotiations, the HCA Hospitals stated they were willing "to negotiate a single [TC] schedule that

5

would apply for all PLPC's anatomic pathology services, regardless of payor, . . . calculated as a percentage of the Medicare rate." (Id. ¶¶ 95–98). The HCA Hospitals "generally considered fair market value" for TC charges "to be between 50% and 100% of the Medicare rate," whereas PLPC "suggested 80% of the Medicare rate." (Id. ¶ 101). The HCA Defendants also suggested that "PLPC consider merging with PathGroup," another anatomic pathology lab. (Id. ¶ 106). Ultimately, however, the HCA Hospitals and PLPC could not reach an agreement regarding the TC charges for patients covered by Other Insurers. (Id. ¶¶ 111–19).

On September 1, 2019, the HCA Hospitals "each replaced PLPC with PathGroup as the hospitals' new anatomic pathology provider." (Id. ¶ 123). The Complaint alleges that "upon information and belief, PathGroup was willing to provide the free services HCA demanded—*i.e.* waived [TC] charges—as a cost of doing business with HCA's hospitals and getting its anatomic pathology referrals." (Id. ¶¶ 126, 138). The Complaint also alleges that the HCA Hospitals were reimbursing PathGroup's TC charges "for just 60% of the Medicare rate." (Id. ¶ 105). This "belief" primarily comes from an email that PathGroup sent to one of the hospitals regarding a $70 charge for a specialty reference lab. (Id. ¶ 171). PathGroup told the hospital that the reference lab incurred this charge before September 1, 2019, so PLPC needed to pay it. (Id. ¶ 132). According to the Complaint, the "clear implication" of this email is that PathGroup was willing to pay the specialty reference lab for these charges if the testing occurred after September 1, 2019. (Id. ¶ 135).

F.     The Instant Lawsuit and Pending Motions

As a result, Relators allege that the HCA Hospitals solicited an illegal kickback from PLPC, and received an illegal kickback from PathGroup, by forcing the labs to cover or subsidize the TC charges as a condition of doing business with the hospitals and getting their anatomic pathology referrals for patients covered by Other Insurers. (Id. ¶¶ 71, 126). By requiring the labs

6

to pay these TC charges instead, the HCA Hospitals received a net financial gain by *not* having to pay TC charges that they allegedly had an "obligation" to pay for patients covered by Other Insurers. (Id. ¶ 71). This illegal kickback, in turn, rendered the claims PLPC and PathGroup submitted for reimbursement to Medicare Advantage false and fraudulent under the FCA, and the claims submitted to TennCare and Blue Cross to be false and fraudulent under the TMFCA.[7] (Id. ¶¶ 141, 144). Relators further allege that the PathGroup Defendants are liable as participants in this scheme because, unlike PLPC, they agreed to incur TC charges in exchange for receiving business and referrals from the HCA Hospitals. (Id. ¶ 155).

On November 12, 2020, Relators filed a sealed *qui tam* Complaint against the HCA Defendants and the PathGroup Defendants based on this alleged kickback scheme. The Complaint alleges six causes of action against Defendants: a claim against all Defendants for violating the anti-kickback provisions of the FCA by "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A) (Count 1); a claim against all Defendants for violating the TMFCA, Tenn. Code Ann. § 71-5-182(a)(1)(A) (Count 4); claims against all Defendants for conspiring to violate the FCA and TMFCA (Counts 2 and 5); and claims against the PathGroup Defendants for their knowing retention and concealment of funds overpaid by the Government, in violation of the FCA and TMFCA (Counts 3 and 6). (Doc. No. 1). On January 29, 2024, both the United States and Tennessee declined to intervene as parties to this case. (Doc. Nos. 30, 31).

The HCA Defendants have now moved to compel arbitration based on the "Alternate Dispute Resolution" clauses in the Professional Services Agreements between PLPC and the HCA

---

[7] The Complaint lists and describes four representative samples of claims that PLPC submitted for reimbursement of its PC charges. (Doc. No. 1 ¶¶ 145–53). The Complaint does not allege any representative samples of any claims that *PathGroup* submitted for federal reimbursement.

Hospitals.  In the alternative, all Defendants have moved to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## II.    HCA DEFENDANTS' MOTION TO COMPEL ARBITRATION

The Court will first address the HCA Defendant's motion to compel arbitration.  See David v. Tesla Inc., 720 F. Supp. 3d 390, 395 (D. Md. 2024) (holding that when a district court is presented concurrently with a motion to compel arbitration and a motion to dismiss under Rule 12(b)(6), "the proper order of operations is to first rule on the motion to compel").  The HCA Defendants argue that Relators must submit their claims to arbitration because the Professional Services Agreements between PLPC and the HCA Hospitals each contain a valid arbitration clause covering those claims.  (Doc. No. 73 at 10–14).  The arbitration clause reads, in relevant part:

> **Alternate Dispute Resolution**.  In the event of any controversy or dispute related to or arising out of this Agreement, the parties agree to meet and confer in good faith to attempt to resolve the controversy or dispute without an adversary proceeding.  If the controversy or dispute is not resolved to the mutual satisfaction of the parties within five (5) business days of notice of the controversy or dispute, the [HCA Hospital] shall have the option of submitting the controversy or dispute to arbitration, which shall be conducted in the county and the state in which the [HCA Hospital] is located.  If the controversy or dispute is submitted to arbitration, the parties shall select the arbitrator within ten (10) calendar days after the [HCA Hospital] notifies [PLPC] that the controversy or dispute will be submitted to arbitration. If the parties are unable to agree on an arbitrator, either party may petition the American Arbitration Association or the American Health Lawyer Association (the "Arbitration Company") for the appointment of an arbitrator according to the procedures for such appointment provided under the Arbitration Company's rules for commercial arbitration.
>
> . . .
>
> The arbitration shall be conducted in a summary manner upon written briefs of the parties if the arbitrator believes that such summary procedure will be adequate to resolve all contested issues fairly.
>
> . . .

The parties reserve the right to contest the arbitrator's decision and to appeal from any award. No disclosure of the award shall be made by the parties except as required by the law or as necessary or appropriate to effectuate the terms thereof. To the extent permitted by law, the parties hereby jointly and severally waive any and all right to trial by jury in any action or proceeding arising out of or relating to this Agreement, or the obligations hereunder. The parties each represent to the other that this waiver is knowingly, willingly and voluntarily given.

(Doc. No. 72-2 at 9–10 (Section 5.O); Doc. No. 72-5 at 10–11 (Section 5.O)).

The Federal Arbitration Act ("FAA") provides that private arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; see also Hergenreder v. Bickford Senior Living Grp., LLC, 656 F.3d 411, 416 (6th Cir. 2011). A party to an arbitration agreement may move to compel arbitration under the FAA. 9 U.S.C. § 4. Of course, "arbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." Seawright v. Am. Gen. Fin. Servs., Inc., 507 F.3d 967, 972 (6th Cir. 2007) (citation and internal quotation marks omitted); EEOC v. Waffle House, Inc., 534 U.S. 279, 293–94 (2002); Stout v. J.D. Byrider, 228 F.3d 709, 714 (6th Cir. 2000).

The issue before the Court is not whether there is a valid arbitration agreement between Relators and the HCA Defendants (there is), it is whether the FAA allows the Court to compel arbitration of qui tam claims that Relators brought "on behalf of and in the name of the United States and the State of Tennessee." (Doc. No. 84 at 10–11). Relators argue that "[b]ecause the United States and Tennessee are the real parties in interest here and have never agreed to arbitrate with HCA," the Court should deny HCA's motion to compel arbitration as a "non-starter." (Id. at 11).

For context, an overview of the FCA's procedures is helpful. The FCA allows either the Attorney General or a private party to "bring a civil action . . . in the name of the Government"

against anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment" to the United States. 31 U.S.C. §§ 3729(a); 3730(a), (b)(1). "A private enforcement action under the FCA is called a *qui tam* action,[8] with the private party referred to as the 'relator.'" United States ex rel. Eisenstein v. City of N.Y., 556 U.S. 928, 932 (2009). After the relator files the *qui tam* action, the United States has sixty days to review the claims and decide whether it will "elect to intervene and proceed with the action" itself as a party. Id. (quoting 31 U.S.C. §§ 3730(b)(2), (b)(4)); see also Griffith v. Conn, 2016 WL 3156497, at *2 (E.D. Ky. Apr. 22, 2016) (Thapar, J.). The Government in this case elected *not* to intervene. (Doc. Nos. 30, 31).

When the Government declines to intervene, the relator conducts the *qui tam* action himself, and the Government is not a "party" for purposes of certain procedural rules. See Eisenstein, 556 U.S. at 931; see also United States ex rel. Welch v. My Left Foot Children's Theray, LLC, 871 F.3d 791, 793 (9th Cir. 2017). But the United States always remains the "real party in interest" in every FCA case regardless of whether it intervenes. Eisenstein, 556 U.S. at 930. As the real party in interest, the United States maintains minimal procedural rights that "include requesting service of pleadings and deposition transcripts, seeking to stay discovery" in certain circumstances, "and vetoing a relator's decision to voluntarily dismiss the action." Id. at 932 (citations and internal quotation marks omitted); see also United States ex rel. USN4U, LLC, 2025 WL 1009012, at *6 (6th Cir. Mar. 31, 2025). Even as a nonparty, the United States stays involved in the case "because the government is the true victim of the alleged fraud," and the Government is the only entity that "has Article III standing to sue" for an injury under the FCA.

---

[8] "Qui tam" is a Latin phrase short for "*qui tam pro domini rege quam pro se ipso in hac parte sequitur*," which means "who pursues this action on our Lord the King's behalf as well as his own." See Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 769 n.1 (2000).

United States ex rel. Mohajer v. Omnicare, Inc., 525 F. Supp. 3d 447, 451–52 (S.D.N.Y. 2021). If the relator ultimately succeeds on his non-intervened *qui tam* claim, the Government takes the lion's share of the recovery for itself (between 70 to 75 percent) as the true victim of the fraud, and the relator takes the rest. 31 U.S.C. § 3730(d)(2).

The relator in a *qui tam* action, "rather than suing because he or she has personally suffered[,] invokes the standing of the government resulting from the fraud injury, and stands in the shoes of the government[.]" Mohajer, 525 F. Supp. 3d at 452 (citation and internal quotation marks omitted). While standing in the Government's shoes, the "relator more or less acts as the statutorily designated agent of the United States and the relator's bounty is simply the fee he receives *out of the United States' recovery* for filing and/or prosecuting a successful action on behalf of the government." Vanderlan v. United States, 135 F.4th 257, 262 (5th Cir. 2025) (quoting Stevens, 529 U.S. at 771) (internal alterations omitted). Relators benefit from this statutory scheme, but the injury asserted in a *qui tam* action always "belongs exclusively to the government." Id. (citing United States ex rel. Polansky v. Exec. Health Res., Inc., 599 U.S. 419, 425 (2023)).

Despite the overview above, the HCA Defendants maintain that the *qui tam* claims belong to Relators themselves because the Government chose not to intervene. Therefore, they argue that the Government cannot prevent Relators from submitting those claims to arbitration. (Doc. No. 73 at 10–11). Relators respond that their *qui tam* claims belong to the Government regardless of its intervention decision, so the claims are not subject to a *private* arbitration agreement that the Government was not privy to. (Doc. No. 84 at 10–14). The Court is not aware of (and the parties do not cite) any Sixth Circuit case addressing whether the FCA claims alleged here may be subject to arbitration. The Court and the parties therefore rely on nonbinding cases for guidance to help answer this narrow question.

11

As a threshold issue, the HCA Defendants contend that the arbitrator, not the Court, must decide whether Relators' claims are arbitrable. (Doc. Nos. 73 at 13; 87 at 3). Although the Court normally decides "gateway arbitrability questions," the parties may include a "delegation provision" in their agreement "to send these gateway questions to an arbitrator rather than a court." Ciccio v. SmileDirectClub, LLC, 2 F.4th 577, 583 (6th Cir. 2021) (citations omitted). "The Supreme Court requires 'clear and unmistakable' evidence that the parties intended to delegate gateway questions to the arbitrator." Id. (citing Blanton v. Domino's Pizza Franchising LLC, 962 F.3d 842, 846 (6th Cir. 2020)). When parties agree that "arbitration *will* be conducted according to the American Arbitration Association National Rules," then in the Sixth Circuit that constitutes clear and unmistakable evidence that the parties agreed to empower the arbitrator because those rules expressly "provide that arbitrators have the power to resolve arbitrability questions." Blanton, 962 F.3d at 844–45 (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 66 (2019)) (emphasis added); McGee v. Armstrong, 941 F.3d 859, 866 (6th Cir. 2019) (affirming that arbitrator would decide arbitrability issues because the agreement "specifies that the arbitration will be conducted according to the American Arbitration Association National Rules").

Here, the agreement mentions "the American Arbitration Association" and the "American Health Lawyer Association," but it does not require that the arbitration *will* be conducted according to their rules. (See Doc. No. 72-2 at 10–11). Under the agreement, the parties can select any arbitrator they want without limitations. (Id.). Only "[i]f the parties are unable to agree on an arbitrator" may either party "petition the American Arbitration Association or the American Health Lawyer Association . . . for the appointment of an arbitrator according to the procedures for such appointment provided under [their] rules for commercial arbitration." (Id.). The Court does not

find that this language—which merely mentions (rather than incorporates) the American Arbitration Association Rules—demonstrates the parties' clear and unmistakable intent for the arbitrator to decide arbitrability issues. Accordingly, the Court must decide the gateway question of arbitrability in this case.

Having considered the cases cited in the parties' briefs, the Court is persuaded by the District of Nevada's reasoning in United States v. My Left Foot Children's Therapy, LLC, 2016 WL 3381220 (D. Nev. June 13, 2016). There the court relied on two fundamental *qui tam* guiding principles: the Government is always the real party in interest, and no party can be forced to arbitration without an agreement. In nearly identical factual posture, the court denied defendants' motion to compel arbitration of *qui tam* FCA claims, reasoning that even though the Government chose not to intervene, those claims still belonged to the Government and the Government was not a party to the arbitration agreement. Id. at *6. "Given the government's interest in the outcome of the *qui tam* action," the court found that relator's involvement did not "somehow transform[] the fraud claims into her own" and subject the claims to a private arbitration agreement. Id. at *4. This Court further agrees with the District of Nevada's reasoning that because the "*qui tam* action 'belongs to' the government, a nonparty to the arbitration agreement," and "requiring both the government and the relator to arbitrate would exceed the bounds of the arbitration agreement regardless of whether the government objects to arbitration."[9] Id. at *5. On that point, the Sixth Circuit is in accord; "arbitration" is a "matter of contract" regardless of intervention so the Government cannot be required to submit to arbitration a dispute that it did not agree to submit. Seawright, 507 F.3d at 972; see also United States v. Cancer Treatment Ctrs. of Am., 2002 WL

---

[9] The Ninth Circuit affirmed the District of Nevada's decision, albeit "on the alternate ground that [relator's FCA] claims do not fall within the scope of her arbitration agreement." My Left Foot Children's Therapy, 871 F.3d at 800.

31497338, at *2 (N.D. Ill. Nov. 7, 2022).  None of the cases relied upon by the HCA Defendants compromise these two fundamental *qui tam* guiding principles.

The HCA Defendants first rely on <u>Knight v. Amedisys Holding, LLC</u>, a Western District of Kentucky case holding that plaintiff's "claim alleging fraud pursuant to the" FCA did not comply with procedural or statutory requirements for a *qui tam* claim because plaintiff did not bring the claim "in the name of the Government."  2016 WL 5661227, at *4 (W.D. Ky. Sept. 29, 2016).  Because plaintiff failed to allege a proper *qui tam* claim, the <u>Knight</u> court concluded that plaintiff's non-*qui tam* FCA claim was subject to arbitration.  <u>Id.</u>  The Court does not find this case helpful for two reasons.  First, Relators in this case did bring a *qui tam* claim in the name of the Government.  Second, there is no such thing as a private, non-*qui tam* FCA claim because a plaintiff cannot bring an FCA claim without satisfying the Act's *qui tam* requirements.  <u>See</u> <u>United States ex rel. Antoon v. Cleveland Clinic Found.</u>, 788 F.3d 605, 614 (6th Cir. 2015) (citations omitted).

The HCA Defendants next rely on two unpublished Southern District of Ohio opinions holding that when "the United States has affirmatively elected not to intervene, it cannot prevent the arbitration of Plaintiffs' FCA claims against the Defendants."  <u>Deck v. Miami Jacobs Bus. Coll. Co.</u>, 2013 WL 394875, at *6 (S.D. Ohio Jan. 31, 2013); <u>United States ex rel. Hicks v. Evercare Hosp.</u>, 2015 WL 4498744, at *3 (S.D. Ohio July 23, 2025).  But in those cases, unlike here, the Government *did not object* to sending the *qui tam* claims to arbitration as long as any arbitral award or recommendation was non-binding on the Government.  <u>Deck</u>, 2013 WL 394875, at *6 (noting that "the United States has not withheld is consent to arbitration of . . . Plaintiff's FCA claim); <u>Hicks</u>, 2015 WL 4498744, at *3 (noting that "the government does not object to arbitration here").  The Government always can "elect to pursue its claim through any alternate

remedy available to the Government," which presumably includes arbitration. See 31 U.S.C. § 3730(c)(5). But here, as opposed to in Deck and Hicks, the United States emphatically "has not consented – and does not consent – to arbitration of the FCA claims asserted in this case." (Doc. No. 89 at 3). This alone distinguishes the present case from Deck and Hicks.

Last, the HCA Defendants rely heavily on the Sixth Circuit's decision in State Farm Mut. Auto. Ins. Co. v. Angelo, 95 F.4th 419 (6th Cir. 2024). There, the relator entered into a settlement agreement that required him to take "all steps necessary" to dismiss his claims against State Farm. Id. at 424. "The district court found that 'all steps necessary' required [relator] to seek the government's consent, as mandated by the FCA, to dismiss his FCA claims against State Farm, and accordingly ordered him to do so." Id. at 429. The Sixth Circuit held that the "district court did not err in holding that the Settlement Agreement applied to the" FCA claims, and in doing so rejected "the argument that release agreements executed after the filing of an FCA case are per se unenforceable." Id. at 430. Based on this holding, the HCA Defendants reason that if courts can enforce a private settlement agreement to release *qui tam* claims, then courts should also enforce private agreements to arbitrate *qui tam* claims. (Doc. No. 87 at 3–4). Although a creative argument, at bottom the HCA Defendants' overread Angelo because the panel merely affirmed the district court's "order requiring [relator] to seek the government's consent to dismiss his claims." Angelo, 95 F.4th at 430. Neither the Sixth Circuit nor the district court held that the relator could dismiss his FCA claims unilaterally *without the government's consent*, thus staying true to the fundamental *qui tam* principle that the Government is the real party in interest. Id. at 429–32. Thus, Angelo is not persuasive here because that case simply confirms that if the Government does not consent, then the relator cannot voluntarily dismiss the claim.

The Court concludes that Relators' *qui tam* claims are not subject to arbitration because those claims belong to the Government as the real party in interest in this case, and the Government did not consent to arbitration. Accordingly, the Court will deny the HCA Defendants' motion to stay litigation and compel arbitration. (Doc. No. 72).

## III.    DEFENDANTS' MOTIONS TO DISMISS

The Court next addresses the HCA Defendants' and the PathGroup Defendants' alternative motions to dismiss pursuant to Rules 12(b)(6) and 9(b). (Doc. Nos. 72, 74). At the motion to dismiss stage, the Court must accept as true all plausible factual allegations in the complaint, draw all reasonable inferences in the plaintiffs' favor, and determine whether they plausibly give rise to an entitlement to relief. Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Where, as here, the Complaint contains allegations of fraud, Rule 9(b) further "requires the claimant to state with 'particularity the circumstances constituting fraud.'" United States ex rel. Martin v. Hathaway, 63 F.4th 1043, 1047 (6th Cir. 2023). "That means *qui tam* plaintiffs must adequately allege the entire chain—from start to finish—to fairly show defendants caused false claims to be filed," and the "complaint must specify the who, what, when, where, and how of the alleged fraudulent scheme." Id. at 1047–48. In addition to pleading fraud with particularity, "the complaint must also provide examples of specific fraudulent conduct that are representative samples of the scheme." United States ex rel. Marlar v. BWXT Y-12, LLC, 525 F.3d 439, 444–45 (6th Cir. 2008) (citations, internal quotation marks, and alterations omitted).

The Court focuses its analysis below on two arguments it finds dispositive for Relators' FCA claims. First, whether Relators plausibly alleged that the HCA Hospitals solicited or received "remuneration" for purposes of an Anti-Kickback Statute violation. Second, whether Relators plausibly alleged that PLPC or PathGroup submitted claims "resulting from" an illegal kickback

for purposes of an FCA violation. For context, the Court will begin with an overview of these statutes and the legal framework for Anti-Kickback and FCA claims.

A.    Overview of the Anti-Kickback Statute and False Claims Act

The FCA "imposes civil liability for 'knowingly presenting, or causing to be presented, a false or fraudulent claim to the government for payment or approval." Hathaway, 63 F.4th at 1045 (quoting 31 U.S.C. § 3729(a)(1)(A)) (alterations omitted). A "claim" under the FCA is simply a request for payment or reimbursement made to a federal health care program. United States ex rel. Flanagan v. Fresenius Med. Care Holdings, Inc., 142 F.4th 25, 34 (1st Cir. 2025) (citations and internal quotation marks omitted); United States ex rel Snapp, Inc. v. Ford Motor Co., 2007 WL 420721, at *3 (E.D. Mich. Feb. 1, 2007) (citation omitted). A claim is "false or fraudulent" for purposes of the [FCA] if the claim includes "items or services resulting from a violation of the" Anti-Kickback Statute.[10] Hathaway, 63 F.4th at 1046 (quoting 42 U.S.C. §§ 1320a-7b(g), 7b(b)(1)(A)) (internal quotation marks omitted); United States ex rel. Folse v. Napper, 2025 WL 2585680, at *13 (M.D. Tenn. Sept. 5, 2025) (citation omitted) (noting that an Anti-Kickback Statute violation that results in a federal healthcare payment is a per se false claim under the FCA).

The Anti-Kickback Statute "was designed to prevent medical providers from making decisions based on improper financial incentives rather than medical necessity and to ensure that federal health care programs do not bear the costs of such decisions." Flanagan, 142 F.4th at 35 (citation omitted). In furtherance of those goals, the Anti-Kickback Statute prohibits medical providers from soliciting or receiving patient referrals in return for "remuneration"—a term that is not defined in the statute, but that generally refers to payments or transfers of value (such as

---

[10]    Relators do not allege that Defendants violated 31 U.S.C. § 3729(a)(1)(B), which imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

kickbacks, bribes, or rebates). Hathaway, 63 F.4th at 1048–52. The parties appear to agree with this definition. (See, e.g., Doc. Nos. 1 ¶ 38; 73 at 18).

To survive dismissal here, Relators must plausibly allege that Defendants violated the Anti-Kickback Statute because they: (1) acted with intent (*i.e.* knowingly and willfully); (2) **to offer, pay, solicit, or receive any remuneration**; (3) to induce or reward patient referrals; (4) involving services payable or reimbursed by a federal health care program such as Medicare. See Hathaway, 63 F.4th at 1052 (citing 42 U.S.C. § 1320a–7b(b)(2)(A)) (emphases added). Then, for Defendants' conduct to be actionable under the FCA, Relators must allege that PLPC or PathGroup submitted claims to the federal government for "items or services resulting from" a violation of the Anti-Kickback Statute. Id.

B.     Remuneration

The Complaint alleges that the hospitals solicited or received "payments and other transfers of value" (i.e. remuneration) by *not* having to pay TC costs that the hospitals were otherwise legally obligated to pay. (Doc. No. 1 ¶¶ 141–44). The problem with this theory of remuneration is that it depends entirely on whether the HCA Hospitals were, in fact, obligated to pay the TC costs to begin with. If the HCA Hospitals never had any obligation to pay these TC costs, then it is not plausible that the hospitals received or solicited remuneration simply by making a business decision not to incur those additional expenses voluntarily. Thus, the critical question in this case is whether anything required the HCA Hospitals to pay the TC costs for patients covered by Other Insurers, including Medicare Advantage (the only *federal* payor implicated in the Complaint for purposes of the FCA claims).

The Complaint alleges that the HCA Hospitals were "plainly obligated" to pay TC costs for patients covered by Medicare Advantage because the 2012 CMS "rule change also restricted [TC] payments under Medicare Advantage Plans—*i.e.* Medicare Part C." (Id. ¶ 71). But the

Complaint does not cite any support for this conclusory allegation. For example, it does not cite to any provision of the 2012 CMS rule, quote any language from the rule, or otherwise provide any explanation for why the rule applied to Medicare Advantage beneficiaries. And for good reason: the *words* of the 2012 CMS rule change *explicitly excluded* Medicare Advantage plans. See 42 C.F.R. § 415.130 (defining "fee-for-service Medicare beneficiaries" as beneficiaries who "are not enrolled" in a "Medicare+Choice plan under Part C of Title XVIII of the Act"). Accordingly, the Court does not find plausible the Complaint's conclusory allegation that the 2012 CMS rule somehow required hospitals to pay the TC costs for patients covered by Medicare Advantage, which again is the only non-Medicare federal payor involved in this case.

Nor does the Complaint plausibly allege any other reason for why the HCA Hospitals "plainly had the payment obligation" for these TC costs. (Doc. No. 1 ¶ 71). Indeed, the Complaint says *nothing* about why Medicare Advantage stopped making TC payments at some unspecified time between 2012 and 2019. The hospitals *may* have had an obligation to make TC payments if the Complaint alleged that Medicare Advantage stopped paying TC costs because (like with Medicare) it was already providing lump sum reimbursements for patients that included TC costs. But the Complaint does not allege that. Medicare Advantage could have stopped paying TC costs for any number of reasons, including that it made a business decision not to bear the costs of those charges anymore. Without additional factual allegations, the Court cannot *plausibly* infer that the reason Medicare Advantage stopped making these payments is because the HCA Hospitals were legally required to pay them. (See Doc. Nos. 73 at 8 n.4; 87 at 5).

What the Complaint instead describes here is normal marketplace competition. Once the Other Insurers decided to stop paying these TC charges (for reasons not explained in the Complaint), the HCA Hospitals simply bet on the market that they could find a lab who would

cover those charges instead. Because there were other labs in the market willing to incur TC costs (i.e. PathGroup), PLPC had to decide whether it was profitable to incur these costs itself. PLPC ultimately had two choices: (1) cover these TC costs and maintain its business relationship with the hospitals as it had done for decades, or (2) refuse and risk losing the hospitals' business to a competitor. PLPC initially chose the former option to avoid having to "disrupt critical patient care." (Doc. No. 1 ¶ 14). But when PLPC put its foot down and required the hospitals to pay the TC charges, the hospitals sent their patients to PathGroup because it was willing to incur 60% of the TC costs. (See id. ¶ 105). These business practices reflect the market functioning as expected. The Complaint does not allege the HCA Hospitals were legally obligated to renew their contract with PLPC forever and ever. Regardless, this marketplace activity does not create a plausible inference that the HCA Hospitals solicited or received remuneration in exchange for patient referrals.

For these reasons, the Court agrees with the HCA Defendants that remuneration is where Relators' "entire kickback theory collapses." (Doc. No. 87 at 5).

C.     But-for Causation

Even if the HCA Hospitals committed an Anti-Kickback Statute violation, which they did not, that does not necessarily mean they committed an FCA violation. "When it comes to violations of the Anti-Kickback Statute, only submitted claims '*resulting from*' the [kickback] violation are covered by the" FCA. Hathaway, 63 F.4th at 1052 (emphases added). This "resulting from" requirement has been around since the Anti-Kickback Statute was amended in March 2010. See United States v. Millennium Radiology, Inc., 2014 WL 4908275, at *10 n.5 (S.D. Ohio Sept. 30, 2014) (citing 42 U.S.C. § 1320a-7b(g)). It is not new. However, the Sixth Circuit recently clarified that "[t]he ordinary meaning of 'resulting from' is but-for causation." Id. "In the usual course, this requires proof that the harm would not have occurred in the absence of—that is, but

for—the defendant's conduct." Napper, 2025 WL 2585680, at *19 (citation, internal quotation marks, and alterations omitted). This means that "for FCA claims predicated on an [Anti-Kickback Statute] violation, the [Anti-Kickback Statute] violation must cause the claims" for federal healthcare reimbursement. Id. Put differently, the labs must show that *but for* the kickback violation, they would not have asked the Government to reimburse them for their anatomic pathology services. Merely alleging that the labs submitted claims that "were tainted by the [Anti-Kickback Statute] violation" is not enough. Id. at *21.

Relators acknowledge that they filed the Complaint in November 2020, more than two years before the Sixth Circuit clarified the but-for causation standard in Hathaway. (See Doc. No. 84 at 14–16). The Complaint therefore relies on an outdated causation standard and repeatedly alleges that PLPC and PathGroup submitted claims "resulting from" a kickback because the claims were "tainted" by kickbacks. (Id.; Doc. No. 1 ¶¶ 39 ("any claim for payment *tainted* by an unlawful kickback renders that claim 'false or fraudulent' for purposes of liability under the FCA"), 163 (Defendants "caused the submission of kickback-*tainted* claims"), 173 (Defendants "submitted claims to federal payors for anatomic pathology services *tainted* by unlawful kickbacks"); see also id. ¶¶ 157–58, 165, 177, 187, 195, 199). Relators argue that their word choice is not dispositive, however, because "the simple fact that [they] used pre-Hathaway language in their pre-Hathaway filing hardly demonstrates that the complaint fails to plead violation of the" Anti-Kickback Statute. (Doc. No. 84 at 15).

Semantics aside, the Court does not find the Complaint adequately alleges that any illegal kickbacks caused *PLPC* to submit claims for federal healthcare reimbursement. The only claims PLPC submitted to Medicare Advantage for reimbursement were for its PC charges, not its TC charges. (See, e.g., Doc. No. 1 ¶¶ 145–53). PLPC continued submitting reimbursement claims

for its PC charges even after the HCA Hospitals refused to pay the TC charges. (Id.). This demonstrates that regardless of who paid the TC charges, PLPC would have submitted its claims for its PC charges anyway. The HCA Hospitals' refusal to pay TC charges therefore had no effect on PLPC's claims to Medicare Advantage. Accordingly, Relators have not plausibly alleged that *but for* the hospitals' refusal to pay the TC charges, PLPC would not have submitted its claims for reimbursement. Without a causal link between the alleged kickback and the claims, the Court cannot plausibly infer that the claims PLPC submitted to the Government for its PC charges were false or fraudulent because of an illegal kickback.

Nor does the Court find that any illegal kickbacks caused *PathGroup* to submit claims for federal healthcare reimbursement.[11] Relators allege that it is their "understanding . . . that the claims that PathGroup has billed government payors for the [PC] of its anatomic pathology services have also been rendered false and fraudulent by HCA's demands for free service." (Doc. No. 1 ¶ 155). Again, there are no allegations that PathGroup's decision to submit its PC charges for reimbursement had anything to do with the HCA Hospitals paying, or not paying, the TC charges. It is also implausible that the HCA Hospitals demanded "free service" from PathGroup, as the Complaint alleges that the HCA Hospitals *were* paying TC charges to PathGroup at "60% of the Medicare rate." (Id. ¶ 105). Although PLPC "suggested" during contract negotiations that "80% of the Medicare rate" was in the "ball-park" of fair market value, this allegation alone is not enough for the Court to plausibly infer that "60% of the Medicare rate" was less than fair market value for TC charges. (See id. ¶ 101). Without any plausible allegations that the hospitals paid

---

[11] The Court collectively refers to the "PathGroup Defendants" as "PathGroup" in this section merely as a matter of convenience, and by doing so the Court is not deciding one way or the other whether the Complaint relies on improper group pleading.

PathGroup less than fair market value for TC charges, the Court cannot infer that a kickback caused PathGroup to submit false or fraudulent claims for its PC charges.

To be fair, the Court could conclude based on the Complaint's allegations that PathGroup would not have received referrals or had the opportunity to submit its claims for pathology services unless (*i.e.* but for) the HCA Hospitals refused to pay TC charges and ending their business relationship with PLPC. However, this Court previously suggested that such an attenuated link is not enough to establish but-for causation for purposes of the FCA. See Napper, 2025 WL 2585680, at *21. The Sixth Circuit also warned courts not to read "causation too loosely." Hathaway, 63 F.4th at 1054. But because Relators do not argue this point, and because they otherwise fail to allege remuneration, the Court concludes that the Complaint does not plausibly allege but-for causation for an FCA claim.

D.    Remaining Causes of Action and Throwaway Request to Amend

Based on the Court's conclusions above, the Court need not address the alternative arguments raised in Defendants' motions, including whether Defendants acted with unlawful intent, (Doc. Nos. 73 at 17; 75 at 18–20), or whether the Complaint relies on improper group pleading, (Doc. Nos. 73 at 19–21; 75 at 11–13). With respect to the remaining substantive counts, the Court must dismiss the conspiracy claim in Count 2 because the existence of a false claim submitted to the government is a "precondition" of a "false-claims-conspiracy" count. United States v. Wal-Mart Stores East, LP, 858 F. App'x 876, 879–80 (6th Cir. 2021) (citing United States ex rel. Crockett v. Complete Fitness Rehab, Inc., 721 F. App'x 451, 459 (6th Cir. 2018)). The Court must also dismiss Relators' so-called reverse false claim against the PathGroup Defendants in Count 3 for knowing retention and concealment of funds overpaid by the Government because, without a substantive "false claim" alleged in this case, there is no plausible allegation that the PathGroup Defendants "received overpayments from the government and failed to refund those

payments." United States ex rel. Ibanez v. Bristol-Myers Squibb Co., 874 F.3d 905, 916 (6th Cir. 2017) (citing 31 U.S.C. § 3729(a)(1)(G)).

Next are the related state law TMFCA claims in Counts 4, 5, and 6. Defendants barely address these claims in their respective briefs because they believe the state law claims rise and fall with the FCA claims. (Doc. Nos. 73 at 24; 75 at 21–22). "The elements of a claim under the TMFCA are 'virtually identical' to those of an FCA claim" and involve the same analysis. United States v. Anesthesia Servs. Assocs., PLLC, 2019 WL 7372510, at *11 (M.D. Tenn. Dec. 31, 2019). However, it appears that the 2019 Blue Cross rule change (see Doc. No. 1 ¶¶ 9, 85, 91) *could* have an effect on the remuneration and but-for cause elements for the TMFCA claims. The Court therefore finds that the best approach here is to decline to exercise supplemental jurisdiction over these state claims now that the federal claims have been dismissed. Martinez v. City of Cleveland, 700 F. App'x 521, 523 (6th Cir. 2017); see also Taylor v. First of Am. Bank-Wayne, 973 F.2d 1284, 1287 (6th Cir. 1992) (holding that "if the federal claims are dismissed before trial, . . . the state claims [generally] should be dismissed as well"). Fairness and comity dictate that Tennessee courts should decide these Tennessee law claims, particularly at this early stage of the case.

Last, Relators argue at the end of their opposition briefs that they should be able to amend the Complaint if the Court agrees with Defendants' arguments for dismissal. (Doc. Nos. 84 at 25; 85 at 24). It is well settled in the Sixth Circuit that these types of throwaway requests are improper because a "request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend." La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 486 (6th Cir. 2010). Moreover, relators are "not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies" without ever formally moving to amend. C &

24

L Ward Bros., Co. v. Outsource Sols., Inc., 547 F. App'x 741, 745 (6th Cir. 2013). Because Relators did not move to amend the Complaint before the Court ruled on the pending motions to dismiss, the Court will not *sua sponte* grant Relators an opportunity to amend the nearly five-year-old Complaint now.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny the HCA Defendants' motion to compel arbitration, grant Defendants' motions to dismiss.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE